UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COOKEVILLE REGIONAL MEDICAL : 
CENTER, *et al.*, :
 :
      Plaintiffs, :
 :
  v. : Civil Action No. 04-1053 (JR)
 :
MICHAEL O. LEAVITT, Secretary, :
Department of Health and Human :
Services, :
 :
      Defendant. :

## MEMORANDUM

Pending before the court is Defendants' Motion to Alter the Judgment [28]. For the reasons set forth below, that motion would be granted if the case were remanded to this court.

## Background

Plaintiffs, fifteen Tennessee hospitals, brought an action against the Secretary of Health and Human Services ("the Secretary") seeking a declaration that the Secretary's method of calculating reimbursements under the Medicare statute's disproportionate share hospital (DSH) formula, 42 U.S.C. § 1395ww(d)(5)(f)(vi), was unlawful. They also sought reimbursement they would be entitled to receive under their interpretation of the DSH formula, for services they provided to low-income patients prior to January 20, 2000 (the date the Secretary began applying the interpretation they seek). Both sides moved for summary judgment.

On September 30, 2005, I granted plaintiffs' motion for summary judgment, denied defendants' motion for summary judgment, and stated that the reasons for the ruling, along with a remedial order, would follow.  On October 28, 2005, I issued a memorandum explaining my conclusion that "the Secretary's exclusionary method of calculating the DSH adjustment that was in effect before January 20, 2005 contravenes clear and unambiguous statutes."  Mem. Order at 20 [dkt. # 22].  I ordered the Secretary to instruct his fiscal intermediaries to correct plaintiffs' cost reports for the fiscal years at issue within 90 days of their receipt of the relevant documentation from the plaintiffs.  Defendants appealed that ruling on December 27, 2005.

Notwithstanding that he had already appealed, the Secretary moved for the entry of final judgment on January 18, 2006, citing Rule 58 of the Federal Rules of Civil Procedure, which states that "Every judgment...must be set forth on a separate document."  Fed. R. Civ. P. 58(a)(1).  On January 28, 2006, I granted the motion, stating:

> The order of September 30, 2005, granting the motion for summary judgment, would ordinarily have sufficed as and for a final, appealable order, but in this case the memorandum explaining that order was not issued for another 28 days, and the later memorandum was accompanied by a remedial order.  The sequencing of the court's orders was not calculated to "avoid dispute and promote certainty," and the government's confusion is

> understandable.  The Clerk is accordingly
> directed to enter final judgment in favor of
> the plaintiff and against the government.

Order of Jan. 24, 2006 (Dk. 25).  Pursuant to that order, the Clerk entered final judgment for the plaintiffs on February 2, 2006.

The February 2, 2006 judgment, which at the time seemed to be a simple matter of bookkeeping, had the convenient effect (for the government) of reopening the 10-day window for motions to alter or amend under Rule 59(e).  The Secretary took advantage of this, and, on February 13, 2006, filed his motion to alter or amend the judgment based on a new statutory provision enacted five days earlier as part of the Deficit Reduction Omnibus Act of 2005 ("DRA").  Pub. L. 109-171.  Section 5002 of that act, entitled "Clarification of Determination of Medicaid Patient Days for DSH Computation," amended the Medicaid provision at issue in this litigation to reflect the Secretary's position, and purported to ratify his regulations of January 20, 2000, including "the policy in such regulations regarding discharges occurring prior to January 20, 2000."

After the Secretary's Rule 59(e) motion was filed, the Court of Appeals stayed the Secretary's appeal pending resolution of the motion that is now before me.  Ordinarily I would be hesitant to rule on a motion to alter a judgment while an appeal is pending.  The Court of Appeals has made it clear that I am to

do something with the motion, however, and accordingly, under Smith v. Pollin, 194 F.2d 349, 350 (D.C. Cir. 1952), I will consider the Rule 59(e) motion and indicate whether I would grant it, so that the Secretary may then ask the Court of Appeals for a remand for entry of the order.

## **Analysis**

An extended discussion of the statutory framework governing the DSH formula appears in the October 2005 memorandum and will not be repeated here. Stated simply, the issue is whether "expansion populations"[1] are necessarily "eligible for medical assistance under a State plan approved under subchapter XIX." 42 U.S.C. § 1395ww(d)(f)(vi)(II). The recently enacted Section 5002 of the DRA amends the DSH formula to state explicitly that such populations are not so eligible:

> In determining...the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX, the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI.

---

[1] I.e., patients who would not otherwise be eligible for Medicaid but who become eligible solely because of the Secretary's waiver of certain Medicaid program requirements as part of a demonstration project under 42 U.S.C. § 1315a.

DRA, Section 5002(a), Pub. L. 109-171 (emphasis added).  The Secretary argues that this amendment is a "clarification" of the DSH formula, rather than a substantive change, and thus, that I should revisit my conclusion about the meaning of the DSH formula in light of this Congressional input.  Alternatively, according to the Secretary, even if this amendment does reflect a substantive change of the DSH formula, in Section 5002(b) Congress has now approved and ratified the Secretary's pre-2000 exclusionary policy toward expansion populations.  That section, entitled "Ratification and Prospective Application of Previous Regulations," states:

> (1) IN GENERAL- [R]egulations described in paragraph (3), insofar as such regulations provide for the treatment of individuals eligible for medical assistance under a demonstration project approved under title XI of the Social Security Act under section 1886(d)(5)(F)(vi) of such Act, are hereby ratified, effective as of the date of their respective promulgations.
> . . .
> (3) REGULATIONS DESCRIBED- For purposes of paragraph (1), the regulations described in this paragraph are as follows:
>
> 1.  2000 REGULATION- Regulations promulgated on January 20, 2000, at 65 Federal Register 3136 et seq., <u>including the policy in such regulations regarding discharges occurring prior to January 20, 2000</u>.

DRA, Section 5002(a), Pub. L. 109-171 (emphasis added).

Plaintiffs raise a number of challenges to this motion. First, they argue that the Secretary's motion was untimely. Second, they argue that the DRA was unconstitutionally approved without passing both houses of Congress, and thus is not law. Third, they argue that the DRA changes rather than "clarifies" the Medicare statute, and that the change either does not apply retroactively to the cost reports at issue or violates their due process rights if it does.  Finally, they argue that the Secretary's decision, even if lawful, was nevertheless arbitrary and capricious.  Each of those challenges is discussed below. None is successful.

**Timeliness of the Secretary's motion**

The hospitals argue that the ten-day period of limitations on Rule 59(e) motions began to run, at the very latest, with the entry of the memorandum order of October 28, 2005, setting forth the reasons for the September 30 order and remanding the matter to the Secretary, because that order fixed the rights and obligations of the parties with regard to the current dispute, "end[ing] the litigation on the merits and leav[ing] nothing for the court to do but execute the judgment." Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 275 (1988).  The Secretary, in his memorandum to the Court of Appeals supporting the appeal of that order, stated that "the October 28 order constituted a judgment pursuant to Rule 54(a) because it is

a final 'order from which an appeal lies.'"  Secretary's Opposition to Plaintiff's Motion to Dismiss Appeal, at 7 (quoting Fed. R. Civ. P. 54(a)).  Plaintiffs make much of this apparent admission by the Secretary of the finality of the October 28 order.

Entertaining the instant motion, filed 97 days after the "final" order of October 28, 2005, does offend the spirit of Rule 59(e)'s ten-day limit, but it does not violate the letter of that rule.  Judgment must be entered on a separate document under Rule 58 before time for an appeal can run out, but the separate document rule is not such a categorical imperative that it cannot be waived, <u>Bankers Trust Co. v. Mallis</u>, 435 U.S. 381, 384 (1978), as, perhaps, by an appellee's acquiescence in an appeal taken <u>before</u> a judgment becomes final.  It seems intuitively correct that taking an appeal would cut off an appellant's right to seek amendment of the judgment appealed from, but plaintiffs have not supported that intuitive argument with case law.  My conclusion, accordingly, is that the Secretary's appeal of the October 28 order did not preclude his insisting that judgment on a separate document was required before time began to run on his other post-judgment options, including his option to move under Rule 59(e).  Moreover, of course, if the October 28 order is deemed not to have been a final order after all, because it was supplanted by the later judgment issued on February 2, 2006, then the status of

the appeal may be in question, but the Rule 59(e) motion is certainly timely.

**The constitutionality of the DRA**

Plaintiffs next challenge the constitutionality of the DRA based on Congress's failure to pass identical versions of the bill in both houses. The predecessor to the DRA, S.1932, was passed by the Senate in a slightly different form than the version passed by the House of Representatives. Despite this discrepancy, the leaders of both houses attested that their respective chambers had passed the Senate version of S.1932, which the president signed into law as the DRA. Because the version of S.1932 signed by the president was not in fact the version passed by the House, plaintiffs argue, enforcement of the DRA violates the bicameral requirement of Art. I § 7 of the Constitution.

This argument fails in light of <u>Marshall Field & Co. v. Clark,</u> 143 U.S. 649 (1892). In that case, the Supreme Court established the rule that courts may not second-guess Congress's attestation as to what bills it has passed:

> The signing by the speaker of the house of representatives, and by the president of the senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed congress....And when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed congress should be deemed <u>complete</u> and <u>unimpeachable</u>....The

>     respect due to coequal and independent
>     departments requires the judicial department
>     to act upon that assurance, and to accept, as
>     having passed congress, all bills
>     authenticated in the manner stated; leaving
>     the courts to determine, when the question
>     properly arises, whether the act so
>     authenticated, is in conformity with the
>     constitution.

Id. at 672 (emphasis added).

Plaintiffs and amicus curiae point to U.S. v. Muñoz-Flores, 495 U.S. 385 (1990), in which the Supreme Court struck down a law that had originated in the Senate in violation of the origination clause requiring bills for raising revenue to originate in the House.  In that case, the Court looked beyond Congress's designation of the relevant bill as "H.J. Res. 648," indicating the bill's origin in the House,[2] and made its own determination that the bill actually originated in the Senate.  However, the Court explicitly stated that its analysis was different from the analysis in Marshall Field, which concerned the "nature of the evidence" a court should consider in deciding whether a bill had actually passed Congress.  495 U.S. at 391 n.4.  In Muñoz-Flores, unlike Marshall Field, a "constitutional requirement binding Congress" was at stake.  Id.

Plaintiffs urge that the bicameral clause is just such a "constitutional requirement binding on Congress," and that a

---

[2] The designation "H.J. Res." is a standard abbreviation for "House Joint Resolution."  See Muñoz-Flores, 495 U.S. at 409 (Scalia, J. dissenting).

statute passed in violation of this requirement may be struck down under the Muñoz-Flores framework.  The argument is a sound one, as far as it can go -- a bill that does not pass both houses in the same form is not good law, no matter what the president does – but, under Marshall Field, it comes to an abrupt stop with the attestation of the leadership of both houses of Congress that they did pass the bill in question.

**The effect of the DRA**

In the memorandum explaining my original judgment, I stated that "the DSH formula unambiguously includes all patients eligible for medical assistance under Title XIX, regardless of the mechanism by which they become eligible."  Mem. of October 28, 2005 at 20.  Moreover, I found that the statutory scheme clearly and expressly included expansion populations among those made eligible for medical assistance under Title XIX.  The 109th Congress, disagreeing, issued what it called a "clarification" now explicitly stating that expansion populations are "not so eligible."  DRA, Section 5002(a).  The Secretary argues that this was the true meaning of the DSH formula all along, and that my understanding of the statutory language was incorrect.  Alternatively, the Secretary argues that the DRA must be applied retroactively to overrule my ruling.

Before reaching the question of whether the DRA was a "clarification" of or a substantive change to the DSH formula, I

should note plaintiffs' argument that the law of the case doctrine prevents this court, at this stage, from accepting the DRA as a clarification.  The law of the case doctrine is the prudent observation that "the <u>same</u> issue presented a second time in the <u>same</u> case in the <u>same</u> court should lead to the <u>same</u> result."  <u>Kimberlin v. Quinlan</u>, 199 F.3d 496, 500 (D.C. Cir. 1999).  Plaintiffs cite <u>McCreary v. Offner</u>, 1 F. Supp. 2d 32, 36 (D.D.C. 1998), for the proposition that the first step in analyzing whether a statutory amendment is a "clarification" is whether the existing law is ambiguous.  Pl.'s Opp. at 14.  Because that question was answered by my first opinion, which described the DSH formula as unambiguously including expansion populations, plaintiffs argue that I am now constrained to find the DRA to be a substantive change in the law.

      The Secretary's multiple filings never offered a cogent response to this argument or, indeed, even appeared to grasp it, as evidenced by his statement that the law of the case doctrine "would not only preclude this Court from considering the new statute, but would also preclude the Court of Appeals from passing on the question."  Def.'s Reply Mem. at 5.  The doctrine applies to the same <u>court</u>, and the Court of Appeals is, of course, not bound by my conclusion that the original DSH formula was unambiguous.

Nevertheless, it is not clear to me that the question of whether pre-amendment law is "settled," McCreary, 1 F. Supp. 2d at 36, is identical to the question of whether it is "unambiguous[]" under Chevron USA, Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842 (1984). In Beverly Community Hosp. Ass'n v. Belshe, 132 F.3d 1259, 1266 (9th Cir. 1997), for example, the court noted that although four different circuits had pronounced the Medicare provision at issue to be unambiguous under Chevron, none of them expressed the same construction of the statute. With so many interpretations endorsed by different courts, the Ninth Circuit did not feel the need even to look to the statute before accepting Congress's statement that its subsequent amendment was a clarification. Id. This suggests some play in the joints between Chevron's ambiguity analysis and McCreary's and Beverly's approach to pre-amendment law.

Accordingly, I will decline plaintiffs' invitation to rely upon law of the case. It matters little, however, because I remain of the view that the DSH formula, as it existed at the time of the cost reports at issue, expressly included expansion populations. That formula referred to all patients eligible for Title XIX medical assistance, and expansion populations' medical expenses are reimbursed from funds allocated under Title XIX. The DRA's insertion of the phrase "not so eligible" into the formula did not "clarify" this simple equation -- it simply

changed it.  See U.S. v. Montgomery County, Md., 761 F.2d 998, 1003 (4th Cir. 1985) ("[A] statute which has all along unambiguously proclaimed WHITE cannot retrospectively be made to assert BLACK just because the legislature, at the later date, says so.")

The Secretary's arguments to the contrary rely not on exegesis of the original language of the DSH formula as now illuminated by the DRA, but solely on deference to Congress's later statement on the matter.  The Secretary points to Supreme Court and other appellate decisions teaching that "[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." Loving v. United States, 517 U.S. 748, 769-70 (1996).  See also Brown v. Thompson, 374 F.3d 253, 259 (4th Cir. 2004) ("In determining whether an amendment clarifies or changes existing law, a court, of course, looks to statements of intent made by the legislature that enacted the amendment."); Piama Cortes v. American Airlines, Inc., 177 F.3d 1272, 1284 (11th Cir. 1999) ("[C]ourts may rely upon a declaration by the enacting body that its intent is to clarify [a] prior enactment."); United States v. Sepulveda, 115 F.3d 882, 885 n.5 (11th Cir. 1997); Liquilux Gas Corp. v. Martin Gas Sales, Inc., 979 F.2d 887, 890 (1st Cir. 1992) (using "legislature's expression of what it understood itself to be doing" to determine whether new legislation is a clarification.).

There is considerable irony in the Secretary's reliance on the Loving line of cases and his exhortation that I assign "significant" and "great weight" to the DRA. His reply to plaintiffs' opposition to his original motion for summary judgment included an entire section entitled "The Language...of Subsequent Statutes Cited by Plaintiffs is Irrelevant." Defs.' Reply at 11. That section was a response to plaintiffs' citation of two subsequent enactments in which Congress, contrary to the Secretary's current view, interpreted the DSH formula to include expansion populations. See Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, § 13581 (defining "Medicaid beneficiary" as "an individual entitled to benefits under a State plan for medical assistance under title XIX (including a State plan operating under a Statewide waiver under section 1115.).") (emphasis added); Balanced Budget Act of 1997, Pub. L. No. 105-33 § 4403(b)(3) (defining the DSH calculation as "including...individuals who receive medical assistance under such title pursuant to a waiver by the Secretary under section 1115."). The Secretary dismissed these statues as the "irrelevant understanding of the 103d [and, presumably, 105th] Congress," Defs.' Reply at 13 n.8, and cited the "canons of statutory construction," id. at 11, that "[L]ater-enacted laws...do not declare the meaning of earlier law," Almendarez-Torres v. United States, 523 U.S. 224, 237 (1998), and "the view

of a later Congress cannot control the interpretation of an earlier enacted statute." O'Gilvie v. United States, 519 U.S. 79, 90 (1996). Why the view of the 103rd and 105th Congresses should be irrelevant for purposes of statutory construction, while that of the 109th should be of "great weight," is a mystery the Secretary has failed to explain. Whatever significance should be given to later legislation declaring the meaning of an earlier statute, at the very least, *conflicting* Congressional enactments purporting to interpret the same statute ought to cancel each other out, particularly when the statute at issue is as clear and unambiguous as the original DSH formula.

Although it is clear to me that the DRA makes a substantive change to the DSH formula and is not a "clarification," it is equally clear that Congress did intend this change to apply retroactively. In reaching this conclusion, I am mindful of the heavy presumption in the law against the retroactive application of statutes and the rule that courts will only apply a law retroactively if there is a clear statement in the statute requiring that result. See Rivers v. Roadway Express, 511 U.S. 298, 307-310 (1994). I find such clarity for two reasons. First, Congress's titling of Section 5002 as a "clarification" is strong evidence of its retroactive effect. A clarification is a statement "of what [Congress] believed the law already was, and thus to be applicable to all cases, past,

present and future." Means v. Northern Cheyenne Tribal Court, 154 F.3d 941, 951 (9th Cir. 1998) (J. Reinhardt, concurring); see also Beverly, 132 F.3d at 1264 ("Congress' characterization [of a new act as a clarification] plainly reflects its intention to resolve every still-live dispute in the manner specified by the new legislation."); Department of Toxic Substances Control v. Interstate Non-Ferrous Corp., 99 F. Supp. 2d 1123, 1133 (E.D. Cal. 2000) ("Repeated use of the word 'clarification'...is clear, unambiguous, and commanding evidence in favor of retrospectivity.").  Second, Congress included an express ratification of the Secretary's conduct in § 5002(b) of the DRA. That section ratifies "[r]egulations promulgated on January 20, 2000...including the policy in such regulations regarding discharges occurring prior to January 20, 2000."

Regarding the ratification provision, plaintiffs argue that there is no mention of any policy regarding pre-January 20, 2000 discharges in the text of the regulations.  But it is evident that Congress was referring to the pre-2000 exclusionary policy described in the Secretary's commentary to the January 20, 2000 regulations.  The plaintiffs also assert, relying on Thomas v. Network Solutions, Inc., 1998 WL 1738180, *3 (D.D.C. 1998), aff'd, 176 F.3d 500 (D.C. Cir. 1999), that in order for a ratification to be effective, Congress must "express its clear recognition of the illegal nature of the [agency action], and its

explicit intent to ratify that [action]."  That may be true in the tax context of the Thomas case, but it makes little sense here to require Congress to recognize agency action as illegal if Congress does not agree that it was.  Insisting on such a requirement would hamstring a Congress that genuinely disagreed with a court's view of an earlier statute: Congress would be unable to "clarify" what the statute meant, because the court would call that a substantive change; and it would be unable to ratify the actions at issue, because it would have to deem them illegal, something it does not believe.  The DRA's double-barreled approach to this conundrum – "clarifying" the DSH formula while "ratifying" agency action that, if Congress were right, would not need to be ratified – resolves this problem by giving the court two paths to the same result.  Whether as a clarification or a ratification, the DRA's expression of the DSH formula must be retroactively applied to still-pending cases.

The path to that result chosen by this court – retroactive ratification – raises what plaintiffs, in a footnote, perceive as a constitutional question.  It is not the case, however, that "retroactivity would violate the due process clause of the Fifth Amendment to the United States Constitution."  Pls.' Opp. at 20 n.16.  See Association of Bituminous Contractors, Inc. v. Apfel, 156 F.3d 1246, 1255 (D.C. Cir. 1998) (economic legislation is accorded a "'presumption of constitutionality'

that can be overcome only if the challenges establishes that the legislature acted in an arbitrary and irrational way."); Adams v. Hinchman, 154 F.3d 420, 424 (D.C. Cir. 1998) (even assuming statute had given federal employees a property interest in earning overtime for services already rendered, "any such property interest could be extinguished so long as the retroactive economic legislation met the guarantees of due process").  Those who operate in regulated fields like Medicare and Medicaid "'cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.'"  Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 227 (1986)(quoting FHA v. The Darlington, Inc., 358 U.S. 84, 91 (1958)).

**The Administrative Procedures Act (APA)**

Plaintiffs argue, finally, that even if the DRA retroactively endorses the Secretary's policy excluding expansion populations from the DSH formula, his decision to exclude them was arbitrary, capricious, and unreasonable, and therefore unlawful.  5 U.S.C. § 706(2)(A).  The plaintiffs rest their argument on the reasons given by the Secretary for changing from an exclusionary to an inclusionary policy toward expansion populations in his January 20, 2000, promulgation.  Rehashing these reasons, plaintiffs state "there is no rational connection between the findings of the Secretary, all of which support the

inclusion of those populations, and the decision by the Secretary to exclude those populations with respect to the hospitals in Tennessee." Pls.' Opp. at 30.

It is not surprising, of course, that there is little connection between the Secretary's pre-2000 policy and the findings he announced in the regulation <u>changing</u> that policy. That does not mean that there were no reasons for the prior policy, however. The Secretary has cited the most obvious reason for his prior exclusionary policy, namely, that expansion populations may have higher incomes than traditional Medicaid beneficiaries, and thus may be a poor proxy for the needy patients the DSH formula is intended to represent. That is reason enough to uphold the prior policy under the APA.

## Conclusion

Because the DRA changed the law regarding the calculation of Medicare reimbursements under the DSH formula, and because that change applies retroactively, the court would **grant** the Secretary's Motion to Alter the Judgment [28] should this case be remanded from the United States Court of Appeals for the District of Columbia Circuit.

                                        JAMES ROBERTSON
                                     United States District Judge